## HARTFORD CITY PAPER CO. v. ENTERPRISE PAPER CO. et al.

### Civ. A. No. 8127.

United States District Court
E. D. Pennsylvania.

Sept. 30, 1949.

M. E. Maurer, Philadelphia, Pa., **for** plaintiff.

W. L. Matz, Philadelphia, Pa., for defendant.

BARD, District Judge.

This is a civil action to recover $3523.97 as allegedly representing the balance due on goods specially manufactured by the plaintiff for the defendants and the storage charges on these goods which were paid by the plaintiff.

On the basis of the pleadings and the testimony, I make the following special Findings of Fact:

1. The plaintiff is Hartford City Paper Company, an Indiana corporation whose home office and manufacturing plant is in Hartford City, Indiana.

2. The defendant Enterprise Paper Company, hereinafter called Enterprise, is a Pennsylvania corporation whose principal office is in Philadelphia, Pennsylvania.

3. The defendant Cellulose and Paper Converting Company, Inc., hereinafter called Cellulose, is a Pennsylvania corporation whose principal office is in Philadelphia, Pennsylvania.

4. The defendants are family corporations with interlocking officers, directors and shareholders, and were interchangeably and indistinguishably involved in the transaction hereinafter described.

5. The plaintiff is in the business of manufacturing glassine and greaseproof paper, and derivatives thereof. One of the plaintiff's products is Lustron, the trade-name for a coated and embossed glassine, which is made in the United States by the plaintiff only.

6. The defendants are in the business of manufacturing and distributing paper and paper products, particularly paper roll specialties and gift wrappings.

7. In December 1946 authorized agents of the plaintiff and the defendants discussed the purchase by the defendant Cellulose of colored Lustron in order to round out Cellulose's line of products.

8. On December 30, 1946 the defendant Cellulose ordered on its own stationery 600 reams of gold Lustron and 300 reams each of red, green, blue, dubonnet and peach Lustron. Each color was equally divided among the following six designs or patterns: Imperial Moire, scotty, cordline, whipcord, broadline and brocade.

9. On December 30, 1946 the defendant Cellulose also ordered 300 reams of silver metalglass in three designs.

10. This order from the defendant Cellulose was on separate sheets, one for each color, and included the color of the Lustron, the number of reams of each design or pattern, the side of the sheets of paper, and that they were to be ream wrapped.

11. On January 2, 1947 the plaintiff accepted the defendant Cellulose's order by acknowledgment on separate sheets of paper containing terms corresponding to those in Cellulose's order, and including the price per ream f.o.b. mill [1], that it was to be shipped as soon as possible, and that the basis weight of the paper was 30 pounds per ream.

12. This Lustron was sold to the defendant Enterprise but was to be shipped to the defendant Cellulose. The plaintiff would not accept the credit of Cellulose alone.

13. The plaintiff began to manufacture this paper in January 1947.

14. The normal production time of Lustron paper was about six weeks. The plaintiff was four months behind in its production of customers' orders. But the defendants' order was a rush order which was completed in about three weeks.

15. On January 27, 1947 the plaintiff shipped the gold, red, and blue Lustron and the silver metalglass.

16. On February 12, 1947 the defendants received and accepted this shipment.

17. Under the customary terms of the plaintiff, which terms were on its invoices and were known to the defendants, the defendants were entitled to a 2% cash discount if the invoices were paid within thirty days, and the bill became due net in thirty-one days.

[1]. Gold Lustron was $7.75 per ream; red, green, blue, dubonnet and peach Lustron was $7.60 per ream; the price per ream for the silver metalglass was not introduced into evidence.

18. The plaintiff's invoices covering this shipment totalled $11,351.74.

19. When the invoices fell due the defendants did not pay them.

20. On March 11, 1947 the defendants requested permission to pay these invoices on the 27th day of March, April, May and June of 1947.

21. The defendants paid a total of $11,240.44 against these invoices and against invoice 5615 which was for another order in the amount of $115.47. None of the payments was made according to schedule.

22. The defendants deducted 2% or $226.77 from the net amount due on the gold, red and blue Lustron and the silver metalglass.

23. The last payment was made by a check dated June 30, 1947 which contained the notation "Paid in full up to date".

24. The plaintiff and the defendants agreed that this check was to cover only the balance due for the gold, red and blue Lustron and the silver metalglass and invoice 5615. It was deposited in the plaintiff's account on July 12, 1947.

25. The plaintiff had not made peach or dubonnet Lustron in any design since the start of World War II. Prior to the war it had made Lustron in these colors but not in the designs or patterns ordered by the defendants.

26. During the discussions in December 1946 it had been agreed that the defendants would have an exclusive right to the purchase of peach and dubonnet Lustron in those designs or patterns which they ordered.

27. The peach and dubonnet Lustron were neither stock patterns nor colors, but were specially manufactured for the defendants.

28. On January 20, 1947 the plaintiff notified the defendant Enterprise that it would receive one ream each in any or all of the patterns of peach and dubonnet Lustron in about thirty days.

29. On February 3, 1947 the manufacturing of the peach and dubonnet Lustron had progressed beyond the point where the paper could be appropriated to another customer's order.

30. On February 3, 1947 the defendant Cellulose notified the plaintiff by telegram to hold up shipment of the peach, green and dubonnet Lustron until further notice.

31. On February 5, 1947 the defendant Cellulose informed the plaintiff that the defendants were undecided at that time whether to have the Lustron shipped in rolls or in sheets, that they were experiencing keen competition at low prices, that they were dissatisfied with the brightness of the colors of the samples of the red and blue Lustron which they had already received, and that they wanted sample sheets of the peach and dubonnet Lustron "if it is at all possible".

32. On February 7, 1947 the plaintiff acknowledged that all shipments would be held up, that it did not know where such competition could come from, that while the finished product was not always to the plaintiff's liking, this was due to a shortage of essential ingredients in the color industry, and that green, peach and dubonnet sample sheets would probably arrive via parcel post on February 10, 1947.

33. On February 11, 1947 the plaintiff completed manufacturing the peach and dubonnet Lustron, and appropriated this paper to the defendant's order.

34. On February 13, 1947 the defendant Cellulose received via express one ream of out-turn sample sheets of each design of the peach Lustron.

35. Out-turn samples are merely representative cuttings from a full run of paper which is being manufactured to fill a customer's order.

36. Out-turn samples are usually sent to each customer without request. They are sent via express or parcel post so that the customer will receive them ahead of the regular freight shipment of his order.

37. Samples prior to manufacture were impractical and not made by the plaintiff, since it would cost as much to make this type of sample as it would to make a minimum run of paper of about 225 reams.

38. There was no agreement that the plaintiff was to provide the defendants with samples prior to manufacture.

39. The substance of a trade custom, which was practiced by the plaintiff and was known by the defendants, provided that cancellations or changes on any paper being manufactured specially would be accepted only if the paper was not actually in the process of manufacture or made at the time of receipt of the notice of cancellation or change.

40. By letter dated February 13, 1947 the defendant Cellulose requested the plaintiff to cancel the orders for the green, peach and dubonnet Lustron.

41. The plaintiff received this letter on Friday, February 14, 1947 in its New York office and immediately teletyped the manufacturing plant requesting cancellation of so much of these orders as was not in progress.

42. The manufacturing plant did not work on Saturdays.

43. In accordance with the information received on teletype from the manufacturing plant on Monday, February 17, 1947, the plaintiff's New York office immediately notified the defendant Cellulose that the plaintiff would agree to the cancellation of the order for the green Lustron only, but that the peach and dubonnet had been completed and had been packed in a railroad car for shipment to New York and would be coming forward within the next 24 hours.

44. The plaintiff refused to agree to the cancellation of the peach and dubonnet Lustron.

45. On February 18, 1947 the defendants notified the plaintiff by telegram to hold up shipment of the peach and dubonnet Lustron, asserting that the colors were unsatisfactory, that samples were to be approved prior to shipment, and that split shipments were to be made.

46. No term in the contract required that the defendants receive samples prior to shipment, that the defendants approve such samples before shipment, or that split shipments were to be made.

47. The peach and dubonnet Lustron manufactured by the plaintiff complied in all respects as to color, pattern and weight with the peach and dubonnet Lustron the defendants ordered.

48. On March 8, 1947 the plaintiff delivered the goods to a common carrier in Hartford City, Indiana, consigned to the defendants in Philadelphia, Pennsylvania.

49. Twice the common carrier tendered this Lustron to the defendants, and each time the defendants refused to accept delivery.

50. On March 25, 1947 the defendant Enterprise rejected this Lustron by a letter to the plaintiff.

51. After the defendants' second refusal to accept delivery of the Lustron, the plaintiff instructed the carrier to store it in a warehouse. The carrier stored this Lustron in a New York City warehouse.

52. The invoice price of the out-turn samples of the peach Lustron received by the defendants on February 13, 1947 is $45.60.

53. The invoice price of the peach and dubonnet Lustron shipped to the defendants on March 8, 1947 is $4734.80.

54. The freight on this shipment which was prepaid by the plaintiff was $64.65.

55. The storage and shipping charges paid by the plaintiff after the defendants had refused to accept delivery are $272.94.

56. The market for this type of paper collapsed in March 1947.

57. The plaintiff used due diligence and its best efforts to find a buyer for this peach and dubonnet Lustron.

58. On October 8, 1947 the plaintiff sold all the peach and dubonnet Lustron, which the defendants had rejected, to the Royal Paper Corporation in New York for $1869. This was the best price the plaintiff could get for this Lustron during the period from April to October 1947.

## Conclusions of Law.

1. This Court has jurisdiction of this case.

■ 2. The plaintiff and the defendants entered into a written contract for the special manufacture of various colored Lustron. This contract, as evidenced by the plaintiff's acceptance of the defendants' offer, was complete on its face.

3. This contract was not subject to any condition that the defendants were to receive out-turn samples or samples prior to manufacture, that the defendants were to approve the Lustron before the contract would be binding upon them, or that split shipments were to be made.

4. There was no dispute that the defendants owed the plaintiff $11,351.74 for the gold, red and blue Lustron and the silver metalglass received and accepted by the defendants.

5. There was no consideration for the plaintiff's agreement to accept less than the full amount owed to them for this paper.

■ 6. The plaintiff is entitled to recover the 2% discount ($226.77) which the defendants improperly deducted from the amount due the plaintiff.

7. By mutual agreement the contract for green Lustron was cancelled.

■ 8. The defendants could not unilaterally cancel the contract for peach or dubonnet Lustron. There was no cancellation of the contract for this Lustron.

9. The plaintiff had completed manufacturing the peach and dubonnet Lustron when the defendants attempted to cancel this contract.

■ 10. The defendants' request to cancel the contract for peach and dubonnet Lustron on February 13, 1947 was a breach of contract.

11. The plaintiff was entitled to refuse to accept this breach, and was entitled to tender delivery of the peach and dubonnet Lustron.

12. The peach and dubonnet Lustron tendered by the plaintiff complied in all respects with the peach and dubonnet Lustron ordered by the defendants.

13. The defendants had no grounds or justification for refusing to accept the delivery of the peach and dubonnet Lustron.

■ 14. Upon refusal of the defendants to accept delivery, the plaintiff was entitled to sell within a reasonable time the peach and dubonnet Lustron on the defendants' account for the highest price obtainable in the nearest available market.

15. $1869.00 was the highest price obtainable in the nearest available market. Seven months was a reasonable time under the circumstances in this case.

16. The plaintiff is entitled to recover the invoice price of the peach and dubonnet Lustron ($45.60 plus $4734.80), less the amount received for this Lustron upon its sale on the defendants' account ($1869.00), plus the freight ($64.65) and storage ($272.94) charges incurred because of the defendants' breach.

17. The defendants are jointly and severally liable to the plaintiff for:

| | | |
|---|---|---|
| (a) The discount improperly taken; | | $ 226.77 |
| (b) Interest on $226.77 from July 12, 1947 to date | | 30.19 |
| (c) The invoice price of all the peach and dubonnet Lustron received by the defendants ($45.60 plus $4734.80) | $4780.40 | |
| Less the amount received upon its sale to Royal Paper Corporation | 1869.00 | 2911.40 |
| (d) Interest on $4780.40 from March 25, 1947 to October 7, 1947 inclusive | | 152.96 |
| (e) Interest on $2911.40 from October 8, 1947 to date | | 345.44 |
| (f) Freight prepaid by the plaintiff for the defendants | | 64.65 |
| (g) Interest on $64.65 from March 25, 1947 to date | | 9.80 |
| (h) Storage charges incurred because of the defendants' breach of contract | | 272.94 |
| (i) Interest on $272.94 from July 16, 1947, the average date of payment, to date | | 36.13 |
| Total | | $4,050.28 |